Now we'll have the case of the UMWA Pension Plan and Trust and others v. Walter Energy and others. This is the case of the UMWA Pension Plan and Trust and others v. Walter Energy and others. Good morning. Good morning, Your Honors. May it please the Court, my name is John Goodchild. I represent the two funds that were created by Congress to provide health care to retired coal miners who are protected under the Coal Industry Retiree Benefit Act of 1992. And that's more commonly known as the Coal Act, codified at 26 U.S.C. 9701 to 9722. The case involves two issues of statutory construction that are matters of first impression in any court of appeals. It also includes one additional issue of statutory construction. I suspect I will not have time to get to that unless the Court has questions. The matters of first impression are first, are Coal Act premium payments within the definition of retiree benefits contained in Section 1114A of the Bankruptcy Code, such that the obligation to make those premium payments might be modified by order of a bankruptcy court. And the second issue, again of first impression, de novo, does Section 1114G of the Bankruptcy Code, which requires that the bankruptcy court find that a modification of retiree benefits must be, quote, necessary to permit the reorganization of the debtor, end quote, before ordering any such modification. Nevertheless, authorizes a bankruptcy court to modify retiree benefits in a case in which the debtor is selling its assets and winding down. Now before I reach the first issue, the Court issued a jurisdictional question. I believe the parties are agreed. That doesn't mean it erases your briefs, by the way. I understand, Your Honor. I only wanted to say that the parties are agreed that the bankruptcy court's order was a final order and thus is fully appealable to this Court under 28 U.S.C. 158D. I'll turn to the first of the issues of first impression. Coal Act premiums are not within the definition of retiree benefits in Section 1114A of the Bankruptcy Code. The analysis starts with the plain language of the statute. 1114A says that retiree benefits, it is a defined term, the term retiree benefits, the entirety of Section 1114 keys off of that definition. It says retiree benefits are payments for medical, disability, or life insurance benefits under, and this is the important part, under a, quote, plan, fund, or program, I'm leaving out a lot of words, maintained or established in whole or in part by the debtor. The key language is payments to a plan or fund that is maintained or established by the debtor. Maintained or established are the key words in issue in the construction between the parties. Can I ask you a question about this argument? So assume for me that, well, I want you to go to 1196 Code Section 1114D. So you say they can't be retiree benefits because they're not negotiable, right? We say they are not retiree benefits because they do not fit within the definition of retiree benefits in the statute, but we do go farther and say our interpretation, which we view as supported by the 11th Circuit's precedents, our interpretation is supported by the notion that non-negotiable benefits make no, a non-negotiable obligation would make no sense to treat under 1114 because 1114 contemplates a negotiation. Okay, and so in response to that, as I understand it, and I'll get them, ask them about this too, they say, well, D, the section I just pointed out to you, talks about authorized representatives for retiree benefits not covered by a collective bargaining agreement. And I think, as I understand their argument, they say, well, that shows right there that there can be negotiation about statutory benefits. What is your response to that? It certainly doesn't, Your Honor. It simply covers all of the private plans that are out there to cover salaried retirees and formerly hourly retirees that weren't covered by a union. In other words, 1114 is intended and does cover benefits that arise under a collective bargaining agreement, but also all other retiree benefits for all other kinds of employees. And we know that the COLAC wasn't in effect at the time that language was put into D, right? We do know that. But I just, I mean, I assume there are, like, other, I mean, just give me an example of another type of retiree benefit not covered by a collective bargaining agreement. A salaried employee's life insurance policy. The salaried employee is not covered by a union, not a member of a union. Maybe that person is an executive. That person gets executive retiree benefits, and those things are covered under ERISA usually and also subject to 1114, assuming that the plan fits, assuming that the payments fit within the definition of retiree benefits. And so here what we're saying isn't that COLAC premiums are necessarily outside the ambit of 1114A because they're statutory. What we're saying is they don't meet the definition, and construing the definition as written doesn't create an absurdity because it's very clear that 1114 is designed to deal with benefits that are established by contract and thus subject to negotiation. In other words, it's a confirmatory point. But the analysis on statutory construction proceeds from the plain language and simply goes from there. In other words, you don't need to reach the point that you're raising in order to conclude that retiree benefits doesn't include COLAC premiums. I want to ask you another question about that, though, the idea that COLAC benefits are non-negotiable. To support that argument, you cite in part to Section 9708 of the COLAC, which states that all liability for contributions to the combined fund shall be determined exclusively under this chapter. When I look at your brief, it seems like you're arguing that this provision requires that liability for contributions to the 1992 benefit fund should be determined under the COLAC, but the provision only refers to the combined fund. Does that language govern the 1992 benefit fund? Your Honor, Section 9708 of the COLAC does not govern premiums to the 1992 benefit plan, and I apologize if we gave the Court the wrong impression on that. The premiums for the 1992 benefit plan are set under 9712 of the COLAC, and they are set by the trustees of the 1992 plan, but once set are not subject to private negotiation. And is 9712 the provision that says what you just said? Well, 9712 has many provisions, Your Honor. It establishes the 1992 plan. It sets the Board of Trustees. It provides for premiums. It's a long section, Your Honor, but it does provide for the trustees to set both the monthly per beneficiary premium and the annual premium. There's two kinds of premiums to the 1992 plan. It seems to me that 9708 and whatever comparable provision of 9712, with respect to the other plan, was what it meant was that the previous provisions of those plans before Congress took them over would not be controlling, but the statute was going to control what the premiums and what all the obligations were. It didn't say they could not be modified in bankruptcy, or they didn't say even that they couldn't be negotiated in bankruptcy, it seems to me. Well, Your Honor, I agree with all of that except for the last part, but the statute says what it says. But we can discern what it means, can we not? Yes, Your Honor, it is your job to interpret the statute as a matter of law. Let me raise, just assume, this is going to be assuming a whole lot of things against your interests, but I'd like to get to a different point. Assume you lose on this definition of retiree benefits because it was maintained in part by these plans, and by the debtor, by the coal company. Second, assume that as all the cases, albeit lower court cases, hold that it can apply, 1114G can apply, even though, Your Honor, Chapter 11 would ultimately liquidate it. Why did you not argue that the bankruptcy court relied primarily to find necessary to permit reorganization? The bankruptcy court relied primarily on the fact that it was necessary for the going concerns sale. You didn't argue it before the bankruptcy court, and you have not argued before our court that true, the modification was required in order to permit the going concerns sale, but that did not require complete elimination of the premium obligations with respect to the debtor, that those obligations could continue. Those obligations would then share with the other creditors in the bankruptcy, and in fact, have an administrative expense. You did make that argument in your reply brief in the district court, but why have you not made that argument? Because, Your Honor, it is important to us that today, when what is at stake is our claim in the Walter case, the Chapter 11 administrative expense and the Chapter 7 administrative expense, that it's important that we present to the court the issues of law and the issues of statutory construction that have never been touched by a court of appeals. In other words, Your Honor, while we have an interest in the outcome of the Walter Energy case, in both the Chapter 11 admin and the Chapter 7 admin, we view, because we have limited resources and opportunity, we view the two issues that we've raised as the ones that have the most importance. I have a question about tax, and I'm going to be generous on both sides with time, if it's all right with my colleagues, because we want to get this right and it's complicated. I certainly agree. On the tax issue, as I understand it, Judge Proctor said it's not a tax, but even if it is a tax, at least payments under the COLA Act, there's no other way to challenge it. And again, I'm sure y'all are trying to confine your arguments because there are so many to make. I mean, nobody seemed to address that. Is there another way that the coal company could have challenged the payments under the COLA Act, assuming it's a tax? Yes, the coal company could have declined to pay the premiums and then challenged them once a penalty was assessed against them. Or could they have filed a refund suit? Something like that. But there is a procedure under which a coal company that pays premiums to either the combined fund or the 1992 plan can challenge the premiums. In fact, there are circuit-level and even Supreme Court decisions that deal with companies attempting to get refunds of their premiums. And so all we're saying in raising the Anti-Injunction Act is, by fronting the issue to the bankruptcy court in the way in which it was fronted, it violated the Anti-Injunction Act. We do acknowledge that that's a timing issue. And that's why, in my remarks, I started out by looking at the 1114A and the 1114G issues because those are the ones that are of first impression. The Tax Injunction Act does relate to the timing. We believe it was violated. But in the end, we think the result of it is that payment of premiums would then trigger the right of the coal company to challenge their premium obligation once paid. And we think that's all the Tax Injunction Act would do. All right. Before you get to questions, I have a question. Going back to your argument about the retiree benefits definition, Congress specified that COLAC funds are Employee Welfare Benefit Plans for the purposes of ERISA. It seems to me that that undercuts your argument that this is some sort of special type of protection unavailable under any type of retiree benefit. What's your response to that argument? Your Honor, it is quite the opposite, and I'm glad you raised the question. COLAC funds are welfare plans within the meaning of Section 3, Sub 1 of ERISA, 29 U.S.C. 1002, Sub 1. What that means is that they fit within the ERISA definition of an Employee Welfare Plan. This court has established jurisprudence on what it means to maintain a welfare benefit plan. That's what Anderson v. Unum stands for. In other words, yes, the other side raised this issue, but it is the strongest point in our favor because once you acknowledge that the COLAC plans are to be treated as ERISA plans, ERISA welfare benefit plans, there is a rich body of case law on what it means to maintain. Right, but in fairness, the Anderson test goes to whether or not something is an ERISA plan, and here Congress has told us that this is an ERISA plan. That's true, Your Honor, but having done so, the entire definition of 1002, Sub 1, talks about a plan that is maintained by an employer or an employee organization, and here we have a union involved in the plan. The other side's argument is because the COLAC plans were fitted into the ERISA definition, then that must mean they must be treated like an ERISA plan that is maintained by a debtor, and we look at it and say the fact that the COLAC funds were acknowledged to be employee welfare plans, employee welfare benefit plans under ERISA, that fact then forces the inquiry into the ERISA inquiry about who maintains and establishes or establishes the plans. So in our view, although the other side attempts to argue in my view quite creatively, if we look at these plans as ERISA plans and ask the question of whether the employer maintains, because we know there is an employee organization if you look at the definition in ERISA. We know there's an employee organization, a union, that is in part establishing and maintaining because the union is a settlor of the COLAC funds, so we know the definition itself is met. The question is whether in addition to an employee organization maintaining, you also have an employer maintaining, and it's undisputed that Walter is not a member of the Bituminous Coal Operators Association, which is the other settlor, so they don't get there that way. They're forced into the Anderson definition, and the Anderson definition requires actual involvement in the plan. It is not enough just to pay premiums. What about our Randolph case that involved precious little more than paying premiums? Yes, that's true, Judge Anderson, but that case, which I think is from 1994, came substantially before Anderson. It was an 11th Circuit case, as I recall, and the prior panel is controlling. It would control over Anderson. Your Honor, quite right. All I'm saying is Anderson, which is also an 11th Circuit panel case, comes after Randolph, first of all, and second of all, the facts in Randolph showed more involvement than Walter could possibly show in this case. You say that, and you say there's nothing but payment of premiums here, but it's almost incredible to me that the HR department of these coal companies didn't provide forms to beneficiaries when they needed to make a claim or answer their questions about where to make the claims and so forth. Two things about that, Your Honor. First of all, none of that is in the record. Second of all, it is factually inaccurate. I understand that Your Honor thinks that that is incredible, but in reality, the UMWA Health and Retirement Funds, which administers the Coal Act funds, handles all of that. So the union handles it all? The union doesn't handle it at all, Your Honor. The union simply appoints the trustees. The trustees, there's two trustees that are appointed by the union and two that are appointed by the Trade Association. Those trustees have a staff. So an employee of the coal company dies. His wife knows nothing, of course. I take that back. Knows nothing in this case, in this hypo. She calls the company, HR department, inevitably. You could take, it's a matter of common experience. Your Honor, respectfully, no. That's not how it happens. The way that it actually happens, and this is true, just standing back from it. The reason why this is going to make sense is, recall what we're doing. The Coal Act funds are established to take care of people, many of whose employers are gone. You're talking about retirees of companies that have left, have sold their assets, have gone defunct, have turned into other companies. What actually happens is, it is the funds staff that communicates to the beneficiaries and their spouses and dependents. The funds staff is actually the entity that has the relationship with these people. And if a beneficiary dies and the surviving spouse makes a call, she or he is calling the funds, not the coal company. I accept your statement. And certainly, it's not in the record anyway. One more question about the question I first asked. Therefore, it will be entirely appropriate from your standpoint if we write an opinion that holds against you. I mean, I know you won't like it, but holds against you on the retiree benefit definition and the liquidation clause, Chapter 7 liquidation argument that you make, but limited to a situation where the necessity to permit the reorganization was the necessity to facilitate the going concern sale. Your Honor, no, I would be bothered in two ways by that. The first reason I would be bothered by it is because that articulation of the standard by a court of appeals would create a significant amount of mischief among the lower courts and the bankruptcy courts, because you can even see in this record where you have a complex debtor, a transaction can be created in order to put the rabbit in the hat, so to speak, Your Honor. So, it's an unworkable standard. If Your Honor were to say it's okay in a liquidating case to modify retiree benefits, but only if it's a going concern sale. We would never say that. We would say we don't address any other situation. But in this situation, the argument has not been made that a major factor in the necessity to permit reorganization as found by the bankruptcy court was to facilitate the going concern sale. Your Honor, again, I don't believe that that would be a workable articulation. If Your Honor were to do that, the reaction among the lower courts would be to attempt to construe it. Sometimes it would be all right to have a modification of retiree benefits. It would depend upon what the debtor was doing. In the absence of some direction, I believe that that would be an unworkable thing, Your Honor. And it would, turn to the second thing, I believe it would cut against not only the literal language of the statute, which we haven't even talked about, Your Honor, but it would also create, in my view, an absurdity or cut against the whole reason why 1114 exists. 1114 exists in order to prevent liquidation. We cited the statements of senators to that effect. That's really undisputed. The prevention of liquidation. You have a bankruptcy court here who literally rewrote the statute in her opinion to say, in a liquidating case, 1114G should read, necessary to permit the liquidation. So, Your Honor, respectfully, no. I would be quite upset by that opinion. Oh, don't you think we can give him a rest now? I have one more question, if I might. Family Snacks does hold that it can be necessary to reorganization in a Chapter 11 liquidation context, even after the sale of a going concern. Does any other case so hold? No, Your Honor, but the situation in Family Snacks, together with the situation you have in this case, is quite instructive. Because, in this case, what you see in the record is the adjustment of the terms of the transaction in order to take into account what could be modified and what couldn't. The record shows, this is A301, the record shows that this transaction was designed in order to allow the purchaser to assume certain obligations that the purchaser didn't think the purchaser could get out of, like black lung. The total number of dollars in all those was $115 million. That's in the record, A301. $115 million. Family Snacks, in this case, actually show you that when it's permissible to modify retiree benefits in a liquidation, it will become necessary. It will become a self-fulfilling prophecy because, Your Honor, the purchaser here had $115 million to give toward non-modifiable obligations like black lung benefits, very similar to the COLAC, by the way. But because there was a chance COLAC obligations could be modified, that became part of the deal. Your Honor, Dale Stover's affidavit in the record establishes that COLAC obligations are worth less than $4.5 million a year to Walter. It was a drop in the bucket. Combined fund premiums every year were $142,000. So I don't accept the notion that, especially in a complicated transaction here where you have assets being sold for total consideration of nearly $1 billion, that it was truly necessary in some way that would require a standard that a going concern sale would need to have elimination of COLAC obligations. So this case is emblematic for why there isn't another case out there like Family Snacks. All right, thank you. All right, we're going to give you a rest now. Thank you for your help. Thank you. I appreciate the extra time, Your Honor. And there's a lot to work through here, so we appreciate you being on the team. I do appreciate it. I would really like the opportunity to talk about liquidation more, but I have taken up a lot of your time. Well, you have rebuttal time. We're going to give you that. Oh, thank you. All right. Finally, I thought you were going to burst over there. You were ready to go. Thank you, Judge Martin. It pleased the Court. Just to begin, the COLAC is a statutory funding mechanism for UMWA retirees who retired before 1992 or before 1994, depending on the funded issue. So you're talking about folks who have been retired somewhere between 20 and 25 years at a minimum. Secondly, it's important to realize that there is no risk that any retiree from the UMWA covered by these funds are going to lose any benefits. The District Court made that finding, DR-41, at page 4, and it's also in the D.C. Circuit's Holland case, 256 F. 3rd at 821. The reason for that is because that's why the COLAC was enacted. It was enacted to create an insured government backstop statutory retirement fund for a confined group of retirees, and when future bankruptcies orphaned more retirees, this is the language of Senator Rockefeller, when it was enacted, he anticipated there would be future bankruptcies that orphaned new retirees that would be covered. He designed it with government backstop funding. I have a question about that. And, Shelby, you have to get over your embarrassment of asking stupid questions. So if we say you don't have any more obligations under the COLAC, we're terminating your premiums. Yes, ma'am. Where does the money come from? There is an abandoned mine reclamation fund that was created by Congress that has a surcharge on coal production, and that fund earns interest, and as that interest accrues on that fund, those interest payments- At current market rates, I mean, is that- Are transferable to the funds as backstop funding. There's also a provision for additional premiums from those employers who are contributing, but the backstop funding is set forth in the statute. Would you like me to- No, that's- Yes, so that's how it works. I have provided the court in a supplemental authority a congressional resource- I'm sorry, a congressional research service publication that was given to the Senate at the time of enactment, and it sort of lays out the basic nuts and bolts of how it works, but I just wanted to make it clear that we're not talking about retirees who are losing any benefits here. It's just a question- I noticed that I'm pretty sure the bankruptcy court did not rely upon that at all, and while the district court noted it, it didn't rely on it, and I guess it could come in as relevant under the equity prong. That's one of the prongs to be considered, but if, in fact, the premiums are due, in other words, if you lose all of these legal issues that are presented to us- That's right. then I'm not sure we ought to take into account the fact that these beneficiaries are going to be okay anyway. Should we? On the statutory questions, no, Your Honor. I just wanted to make the point up front that that's what we're talking about. In terms of- Is it relevant? I mean, it's almost impossible for the bankruptcy court not to consider that, but is it relevant under the equities prong? I mean, it is part of the factors that she looks at at the end of her opinion, the nine factors which aren't at issue here. The district court affirmed all of her factual findings in that opinion. I think it's important to pick up on your question, Judge Anderson. Mr. Goodchild conceded below that this was in the best interest of Walter Energy's bankruptcy estate, and as you pointed out, the district court made a factual finding that this was necessary to facilitate the reorganization of the debtor. I did notice that the bankruptcy court relied heavily on the fact that it was necessary for the ongoing sale. Yes. But the district court did not. He was less specific, at least. Well, he had affirmed all of those factual findings. That was what happened is at the front of Judge Proctor's opinion, he affirms all of her factual findings. Mr. Goodchild is trying to make this liquidation point as a legal issue, but as you pointed out, it really is a factual issue. It's also legally a false dichotomy. Before we get there, maybe you go ahead and use your time, and then I'll ask this question when your time is up. My presiding judge, I think, will let me do that. If you want to ask the question, I'll take it. It seems to me that it's clear that this was necessary for the ongoing sale. What is not at all clear to me is that why the modification could not have been made in a manner that protected Warrior, the purchaser, but did not relieve the debtor of its obligations. Well, Your Honor, it's the same obligation. It's being canceled on both sides of the transaction. I know, but you can modify it anyway. It could have been modified to say it is terminated with respect to the purchaser, Warrior, but saved with respect to the debtor. Could it not? Maybe it couldn't. You certainly couldn't terminate it. If you terminate it altogether, it protects the debtor too, but why couldn't it have been modified in that manner? Well, the facts before the bankruptcy court were that there was zero cash after the transaction to pay for any of this. Once the sale closed on the core Walter Energy assets, there was zero cash in the estate. I thought they got paid a billion dollars. No, that's the buyer's credit bid, Your Honor. That's a billion three, but in terms of the debtor and the debtor's resources, there were no cash. Right, but let me back up. So did the debtor get any cash? I thought he got a substantial amount of cash in the sale. No, Your Honor, this was a credit bid situation. The secured creditors have interest in the debtor, and rather than go through a plan, they bought the company, reorganized, and have saving the mines, preserving the jobs, avoiding the environmental consequences. That's the going concern. So you have the secured creditors in the bankruptcy make a bid of the debt that they're owed, and they turn that into equity by virtue of the bankruptcy. So then there was no cash left to pay the additional premiums that were due after the sale. As I understand it, premiums were paid through the sale. Correct. We were current up until the closing of the sale, Your Honor. And nobody thinks that the premiums would continue to be due after the company is actually liquidated. Correct. Is that correct? Yes. Okay. So we're talking about the premiums for a period of about a year. So stepping back from that factual issue to the legal question, the COAL Act requires three things. It requires the company who is operating to post security, second, to pay premiums, and third, to maintain their own employee retirement fund. It's called an IEP. Walter Energy had an IEP that covered 572 of these pre-'94 retirees. We have our own plan, we pay for it, and we administer it. And the statute requires, Section 9711, requires the company to maintain that. When Walter Energy goes through this transaction, the most important thing, in the language of Mr. Goodchild below, the primary source of benefits here was our plan that we indisputably established and maintained. We canceled that. So 572 retirees that we were paying for, the primary source of the benefits cut off here, we had to cancel that. So that's the main chunk of it. You canceled that as of the date of the sale. As of the date the sale closes, Your Honor. We stop our IEP. Those 572 retirees then move into the 92 plan. Okay? The premiums that we were paying were for 32 retirees covered by the combined fund that we weren't covering in our own plan. That's just $147,000. But the big premium on his side of the case is the four-plus-million-dollar premium, and that's for 572 retirees to move into that plan. So there's a big piece of this that we established and maintained that we had to cancel because the buyer wasn't going to set up a new plan for those retirees. So that shows you that these obligations have sort of, they're intertwined on both sides of the transaction. That's the point I was trying to make. Can I direct you to the same question I asked opposing counsel on this negotiability requirement? Yes. So as I understand it, certainly a simplification of the argument is because the COLAC payments are not negotiable, they're required by statute, they can't be a retiree benefit. Your response to that says that in 1114D, it provides for an authorized representative for persons receiving, quote, any retiree benefits not covered by a collective bargaining agreement. Yes, sir. And you say, well, that means the COLAC. No, well, I mean, as you pointed out, the COLAC postdates this. Yes, but I mean, you say that that is evidence that the COLAC benefits are negotiable. It's a textual clue that shows in the structure of 1114, there are provisions made for representatives of the retirees who are covered by a union under a collective bargaining agreement. And there are also means to cover non-collective bargaining agreement. But the point we were making there is it covers contractual and non-contractual. Okay. But there are other categories besides retiree benefits. To answer your question, I'll take you back a page if you have the red brief and the statutory appendix so that we're reading out of the same hymnal. I will. Page A3 of the red brief has 1114A. And if you have the language there, you'll have it. I've got it right in front of me. So the more important piece of this, Your Honor, is the use of the word any plan, fund, or program. It's any. Congress wrote this language to be exceedingly broad. Any plan, fund, or program. And then this picks up on Judge Anderson's point, parenthetical, through the purchase of insurance or otherwise. Close friend. That indicates, as Judge Anderson pointed out in the Randall case, all that was at issue in Randall was the payment of premiums for an insurance policy. And this court in Randall holds that that is an ERISA plan. And then picking up on Judge Pryor's point, the COLACT itself tells us that this is an ERISA plan. And if you look at 1114A, it fits snugly within any plan, fund, or program through the purchase of insurance or otherwise, maintained or established, including our IEP, covering 572 employees, that we wrote the plan. I mean, we administered the plan. We funded that plan in full. But then you have in whole or in part by the debtor, insofar as we're talking about the premiums paid to the COLACT funds, that, through the payment of insurance or otherwise, is sufficient under the language of 1114A and in the language of Randall. I have another question. Yes, your Honor. The COLACT funds argue that Section 1129A.13 makes clear that retiree benefits refer to obligations that a debtor contracts for and not premiums under COLACT that are statutory. And they rely on the language in 1129A.13 that says that the debtor has obligated itself to provide such benefits, reading that as a contractual obligation. I didn't see that you addressed that argument in your brief, and I wonder if you could comment on it. Sure, your Honor. I think if you read that language in context, it's talking about the debtor is obligated itself to provide in the bankruptcy court itself. I don't know that that language has the heft that he wants to give it. If you look at 1123B.4, it makes it clear that the bankruptcy court has the authority to authorize a going concern sale by selling assets, and via 363 and 1123, that's what happened here. And that's in the language of the case law sufficient under, Judge Anderson asked the question of Mr. Goodchild, which cases hold that a going concern sale is sufficient. The first case, starting at the top, is Maxwell Newspapers from the Second Circuit. That's relied on by the bankruptcy court at page 25 in Note 42. That's 981F2 at 91. And then Judge Anderson's already spoken of Family Snacks. Hoffman Brothers is a Ninth Circuit BAP case. Family Snacks is an Eighth Circuit BAP case. Both Hoffman Brothers and Family Snacks are in our brief. And then going down to the bankruptcy courts, you've got Alpha, Horizon, and the Ionosphere case. And Ionosphere is important because Ionosphere makes it clear that if a Chapter 11 debtor cannot modify either a collective bargaining agreement under 1113 or its retiree benefits under 1114, when it goes through a going concern sale, what happens? Well, 1114E gives uber priority to payments to retirees. And so if you can't modify in a going concern sale, what that means is all of the money made from the sale goes straight to the retirees to the detriment of all of the other creditors. And that's inconsistent with the purpose of bankruptcy. If that's what the court holds, it will have two significant effects. On this case, it would undo the closing of the sale because 1113 uses the same language. The collective bargaining agreement was canceled. So he's collaterally attacking the 1113 order if that's what this court holds. But more importantly, any debtor who wants to reorganize, who has a collective bargaining agreement or large outstanding retiree obligations, will go straight to Chapter 7, straight to the chop shop, piecemeal liquidation. And the bankruptcy court held that that would be a disaster here. And that's a factual finding that she made at page 47 and 54 of her opinion. And our bankruptcy court made that same finding. That's her findings, Your Honor. Bankruptcy record 1489, pages 47 and 54. And Mr. Goodchild's comment about how it was in the best interest is District Court record 23, page 39. Thank you. We have more questions. Just one more. I want to answer my tax question. So assume for me that the COLAC payments are a tax. Yes, Your Honor. Mr. Goodchild says there are other ways you could have challenged your payments. You could have quit making them and paid the penalty or you could have brought, or at least I'd suggest that you could have brought a refund action. Yes, Your Honor. If it's a tax. As I understand the analysis, if it's a tax, then the next thing we have to look at is was there another way to challenge the tax? I was sort of surprised by the answer. Well, I want your answer. Okay. The reason why I was surprised is that he seems to suggest that there's no jurisdiction in the bankruptcy court for adjudication of taxes. And that seems to suggest that he wouldn't have jurisdiction over his own administrative claim. That's how jurisdiction works. It's not, the court only has jurisdiction to rule for him and not for me. That's not how it works. So if that. But could you, how would you challenge it? Well, first of all, this is so far afield from where we are. 11 U.S.C. 505 trumps the Anti-Injunction Act, which is why the IRS in this case and in any bankruptcy case when they show up, they don't tell the bankruptcy judge that he or she can't adjudicate the taxes of the debtor. 505 says the court may determine the amount or legality of any tax or any addition to tax whether or not previously assessed. So even when the IRS shows up, they don't wave around the Tax Paying Injunction Act through their government lawyer because the bankruptcy court in 505A adjudicates taxes all day long. Now, Mr. Goodchild is not a government lawyer. He doesn't work for the IRS or the Department of the Treasury. So he's making sort of a very surprising argument that there's no jurisdiction. I mean, I ask him. Oh, I know. But there are a number of other reasons why it's not a tax, and if you want to. I'm asking you to assume that it is a tax. I mean, we've got to work through all these issues, and I'm just trying to be sure I've got the framework. If it's a tax, it can be adjudicated in 505A. It's a simple answer. Okay. I've got some questions, in fact. All right. On the Tax Paying Injunction Act, I thought that the Supreme Court case, NFIB, was controlling and would indicate that it's not labeled a tax in the COAL Act, and it's labeled a premium. And why doesn't that control? It absolutely does, Your Honor. Okay. Now, as I was listening to you just now, sounds to me like, and I want you to make sure what I say is correct and tell me if it's not. The reasons why this termination of retiree benefits under 1114G was necessary are, number one, necessary to facilitate the ongoing sale. Is that correct? Yes, Your Honor. Number two, there would be no cash left anyway after the sale to pay these premiums. Is that correct? Bankruptcy Court, 1489, pages 35 and 36. That's her order. And the hearing, it's… Bankruptcy Court opinion at what page? 35 through 36. Okay. And the hearing, Bankruptcy Court record 1336, page 91, page 152, is the testimony that there will be zero cash to pay.  Yes, Your Honor. Third, that if we held as your opponent would like us to hold, nobody would ever continue in a Chapter 11 situation because they would simply go immediately to Chapter 7, liquidate, and terminate their premiums. Is that what you said? I did, Your Honor, because the language of 1113 and 1114 on necessary for the reorganization of the debtor appears in both statutes. And that would mean that someone who wanted to do a, let's say, old GM wants to go through a going concern sale to salvage it after the recession, but they have existing collective bargaining agreements. If these two statutes don't apply to old GM, all old GM can do is go straight to the chop shop. They can't go through as they did Chapter 11 and cancel their collective bargaining agreements and modify their retiree benefits and come out the other side as a new business. And you said, and I think I do remember that ionosphere says the same thing. Is that correct? Well, ionosphere talks about a little bit different subject, which is the uber priority. And what that means is he says if you can't modify it, what that means is because retiree benefits in the language of 1114E have priority, and if you can't modify them, then what happens after a 363 asset sale, any money earned from that would go directly to the retirees. So in that case, there were $5 million in outstanding obligations that the debtor owed to the retirees. They go through an asset sale that earns $1.9 million. And the judge in ionosphere says if we can't modify the retiree benefits and you look at the priority under 1114E, then all that $1.9 million is going to go only to the retirees. And that violates 1114G, which says any ruling on this has to be fair and equitable to all the creditors specifically, and then generally bankruptcy is designed to treat all of the creditors fairly and equitably. So did that apply? Did that rationale apply in our case or not? Ionosphere is relied on by the bankruptcy court in her opinion, Your Honor. But there was no cash in our case. Because of the credit bid, yes, Your Honor. Was there any other reason that this was necessary to permit reorganization? Can you please give me 1489? So Judge Mitchell's opinion is bankruptcy court record 1489. And her findings are extensive and uncontested for purposes of the appeal. But after you get through the front half, she goes through, starting on page 39 of her opinion, the final proposals are necessary to permit the going concern sale of Walter Energy, starting on paragraph 70 and going through paragraph 78, Your Honor. That's pages 39. And those are all the reasons. Through 44. Yes, Your Honor. Okay. How do you respond to your opponent's argument that if these obligations can be modified, they will always be necessary to the transaction because the transaction will be structured that way? I'm sorry. Can you repeat that? Sure. If we were to rule that the obligations can be modified by the bankruptcy court, how do you respond to his argument that it will always be necessary to the reorganization because the transaction will be structured so that that's the case? As I understand was the case here, according to him. I think the best answer to respond to that, Judge Pryor, is that's contrary to the spirit of 1113 and 1114, which were passed to encourage the parties to negotiate over these things. The whole idea of both statutes is to encourage the parties to work it out, to try to maximize the assets and reach a negotiation, a compromise, if you will, that helps both sides. And if they can't reach that negotiation, then the court may have to step in to modify or cancel the collective bargaining agreement. That's what happened in this case. We had a dual-track scenario. We tried to negotiate with the UMWA to get $150 million worth of concessions. They wouldn't go along. The secured creditors realized they were going to have to put more and more money, and they just said we're going to slip off the plan and go to the 363 sale, and we'll reorganize that way. So I think that argument from him puts the cart before the horse. The purpose here is negotiation, and the court only has to step in if the parties can't agree. So, I mean, that's – we went to the UMWA before we filed for bankruptcy. One of the parties we met with – Why would any business person trying to make a deal say, by the way, we want to pay more? I mean, once they know they don't have to. Right. I mean, that's his point. Okay. I mean, I just – I don't think that's the way it works generally, and I don't think that's the way it works here. I mean, the record shows that we went through several rounds of negotiation with the UMWA. In fact, they were a party, obviously, that we met with before we even filed for bankruptcy. So it's not like we structured this deal to – you know, from the get-go. That's just not how it worked, and as he's admitted, this is a drop in the bucket. I mean, the obligation of the COLAC funds is $5 million of a $1.3 billion bankruptcy. I – well, hold up just a second. In effect, what his argument that Judge Pryor and Judge Martin are talking about now is that this proposal was manipulated in order to make it necessary. But that would certainly be an argument that could be brought up under the equitable prong, could it not? I mean, if a proposal were really manipulated and it wasn't really necessary, that would be easy to see through, would it not? In the abstract, yes. And in this case, it's not what happened. And there's frankly no argument to us, anyway, that it was manipulated, I don't believe, was it? No. But, I mean, the record on that is that before we filed for bankruptcy, we met with the UMWA on July 8th. Bankruptcy Record 1094, Exhibit B, Paragraph 5. We made the first proposal for $150 million in savings after we filed for bankruptcy on August 26th. There were five meetings with the UMWA in August and September. Bankruptcy Record 1094, Exhibit B, Paragraph 14. The UMWA agreed to some topics and didn't agree to others. Just so you know, I'm not accusing you or your client of manipulating anything, and I don't think Judge Pryor is either. Okay. All right. Thank you. Yes, sir. May it please the Court. I am here on behalf of the interested non-parties, Warrior Metco, the purchaser, and the Steering Committee. I just have a few things to say, and then I'll answer any questions the Court may have. First, I join in all of Mr. Smith's arguments. I think he did a fantastic job, and we agree with everything he said. Secondly, I just want to make sure I'm here to protect the buyer's interest. Judge Anderson, it was music to my ears when I heard a comment from you saying that you thought it's okay to cut off liability for the purchaser and the purchaser going forward. In fact, in their pleading, Mr. Goodchild said, and I quote on page one of his opening brief, reversal of Section 1114 order will not affect the underlying sale order, the buyers of the debtor's assets, or the buyer's possible obligation to pay COLAC premiums after the sale closed. I like hearing that, and I'm here to make sure that that is what happens. But to the extent the Court wants any further argument, we think that the plain language Bankruptcy Code Section 363M and the Steffen case, this 11 circuits court out of 2014, interpreting it pretty much puts a stop to all that. So I'll answer any questions the Court may have, but we want to make sure that there's no liability imposed upon the purchaser from this appeal. I mean, that question's not before us, is it? You bought the assets free and clear of any future COLAC obligations, right? Yes, and whether or not it's before the Court I think is a question and a concern. We hope it isn't. We think it might not be based on what the appellant said, but then they turn around and also ask for the Court to reverse the order. We still have claims and an interest in what is remaining in the debtor's assets, even in Chapter 7. There's other stuff that we are entitled to get out of that. And so to the extent this Court were to order something that would somehow impose obligations on the remaining assets that are earmarked to go to other places, including us, that could possibly impact that. And that may be one reason you made the 1114G termination a condition of the sale also. That is correct, Your Honor. And I suppose your potential liability was as a successor in interest, is that right? That is correct, Your Honor. And both the Bankruptcy Court and the District Court found we were not successors. And, of course, it doesn't matter with respect to the Coal Act obligations if they are terminated. Correct, Your Honor. Thank you for your time. Your Honor, I'd like to pick up right there. You did slight of hand to say that there was no cash. All you have to do is look at A301 of the record. A301, is that what you said? That's correct, Your Honor. Paragraph 12 of the Bankruptcy Court's findings in which the Bankruptcy Court details who gets what under that transaction. And what you'll see there is that instead of providing the cash to the debtor's estate, the transaction was designed to create specific trust funds so that the cash that was being provided in exchange for the sale was kept away from people. Now, the kept away from people part is my editorialization, so I apologize for that. But the fact that consideration was paid in is clear in the record in A301. So that goes both to the point of whether there's something to get and the fact that the purchaser is here as a competing claimant suggests that there is something to get. And it also goes to my point about the design of a transaction. Now, Judge Anderson, you asked some questions about design of the transaction and also the negotiation point. The transaction was not negotiated among everyone. The transaction was negotiated behind closed doors between the secured creditors of Walter Energy, their debt holders, and Walter Energy itself. The COLAC funds didn't have a seat at that table. Nobody else had a seat at that table. Coates said you didn't make that argument to the Bankruptcy Court. No, Your Honor, that's not what the court ruled with respect to this particular argument. I do agree that the Bankruptcy Court made certain preclusive findings with respect to my client. All I'm saying is I think I'm making a different point, which is the issue of the design of a transaction and how this court's ruling affects how transactions are designed. Transactions in bankruptcies are designed behind closed doors and then are presented for approval. And by the time they're presented for approval, what's necessary to them is already baked in. And that's all I'm trying to say about it. So with respect to all of the discussion on design of transaction and the possible results coming from a ruling from this court, I do think it's important to consider how these things actually happen in Bankruptcy Court. Now, with respect to the negotiation point, the record is clear that there was no negotiation whatsoever on the Cole Act. Yes, the Bankruptcy Court made factual findings about the discussions between the debtor and the union, but the record is clear that the union refused to negotiate on Cole Act because it said that it was a statutory obligation. And that is at A273. The United Mine Workers of America Union said, the UMWA rejects the debtor's proposal as inconsistent with the statutory requirements of the Cole Act. Benefits under the Cole Act are required by federal law, and the UMWA has no authority to agree to any suspension or reduction in any such benefits. So to the extent that there are factual findings about negotiation, the record is clear there was no negotiation with respect to the Cole Act. And I do think that's an important part of the record. There was some discussion about Section 9711 and something called an IEP. And it's true, the Cole Act requires that certain employers maintain individual employer plans to provide health benefits for their retirees. In fact, that is a central tenet of the Cole Act, and it is true that any such plan would be maintained by the debtor. That's true. But the Section 9711 requirement terminates when the debtor stops being in business. Don't be misled, Your Honors. There's no question. It's not before you whether the termination of the IEP was authorized under Section 1114A or G. That's not the issue. That IEP terminated because of the sale. The obligation expired as a matter of federal law. We're talking about the obligation to make premium payments to the funds. And the 1992 benefit plan is the fund that took and took over all the health care for all the people that used to be in Walter's individual employer plan. In other words, my client is now responsible for providing benefits to all those people that Walter Energy used to have in its individual employer plan. So the Section 9711 obligation and how that relates to retiree benefits is a red herring. Retiree benefits and that definition must be viewed in relationship to the premium obligation to the funds and not to the 9711 obligation. And that, I think, takes me to Randall. Now, I think the parties are agreed that it is this court's own precedent that determines whether the COLACT funds are maintained by the debtors. This whole discussion of whether 1114A applies boils down to, did Walter Energy maintain the COLACT funds? And that question is a question on which there is controlling authority. Randall and Anderson, we acknowledge, controlling authority on the question. But Randall didn't just deal with writing a check. Randall, and I'm looking at the reported decision in Randall. In Randall, the employer decided to help his employees purchase insurance and to provide an incentive for them to do so. The employer contributed $75 toward the cost of the monthly premium for each employee. In other words, the employer took on a share of the employee's burden The employer wrote a check for the full amount of the first premium. In other words, the employer extended credit to the employees, paid some of what they had to pay. The employer then used payroll deduction to debit the employee's account to get the money back. In other words, to have the employer's loan repaid. And then did that every month. This court held that that meant that the employer was maintaining the fund. It was all of the facts. It was the continuing involvement.  This court's own precedence established that maintain means something. It means involvement. You do not have facts in this record that would support a conclusion under this court's precedent that the COLAC funds were maintained, even in part, by Walter. So to the extent Randall controls, Randall controls and requires a reversal. Now I do, if it's all right, your honors, I would like to talk a little bit about liquidation. There have been two points made about liquidation. It is undisputed. The statute doesn't say necessary to permit a go and concern sale. The statute doesn't say necessary to permit a liquidation. The bankruptcy court, this is at A331, the bankruptcy court literally rewrote that statute. It said, literally, in a liquidating chapter 11, the language should read, should read, necessary to permit the liquidation of the debtor. Now, your honors, I believe that that right there is a violation of statutory construction. But we can move beyond it because the entirety of the bankruptcy court's order proceeded from the idea that a bankruptcy court could simply rewrite the language of the statute. There was no discussion of whether liquidation meant the same thing as reorganization. The district court considered the question and said, I know I'm supposed to construe the statute literally, and I know it doesn't say liquidation, but if I don't construe it to include liquidation, I'm going to get an absurd result, a result that is at odds with the meaning of the statute, and so I'm going to deviate. I'm going to use the Bob Jones analysis instead of the Ron Payer analysis. That's what the district court did. Here, the bankruptcy court's findings, the bankruptcy court says this a number of times in her opinion, the bankruptcy court said this is a case in which the debtor has failed to restructure using a plan of reorganization and has determined to wind down. In other words, this is a case in which the record is clear. Walter was not going to emerge from bankruptcy. That's not GM. That's Walter going out. That's what we have here. We have a case in which a debtor is selling all of its assets, going concern or not going concern is not relevant. Selling all assets, ceasing to exist as a going concern, not emerging from bankruptcy, that, Your Honors, is a liquidation. And it is true that the term reorganization, as used in Section 1114, is not defined in the bankruptcy code, so we don't have an affirmative definition from Congress. But we do know in the bankruptcy code that there is a difference between a reorganization, whatever that is, and a liquidation. Liquidation is distinguished from reorganization in at least three important pieces of the bankruptcy code. In other words, reorganization does not include liquidation, and liquidation is not a part of reorganization. And the three parts of the bankruptcy code that tell you that are 1141D3, which presumptively denies a discharge to a Chapter 11 debtor, even in a plan, when the debtor is selling substantially all of its assets and is not going to engage in business, just like Walter. The second part is 1129A11. Section 1129A11, that is the part of Chapter 11 that requires that a plan be feasible before it can be confirmed by a bankruptcy court. Congress required in that section that a bankruptcy court find, before confirming a plan, that the plan is not likely to be followed by, quote, the liquidation, comma, or the need for further financial reorganization, comma, of the debtor. In other words, two different things. A plan can't be confirmed unless the judge finds it will not be followed either by a liquidation or a further need for reorganization. In other words, they're different. Liquidation isn't reorganization. We are not free to just say liquidation, in some cases, is just another way to reorganize. That improper use of language, that loose use of language is precluded by the bankruptcy code. And there's one other spot, Section 101, Sub 23, and Sub 24. This is where the definitions of foreign proceeding and foreign representative are made in the bankruptcy code. Congress, in making those definitions, distinguished between a foreign proceeding that is designed to reorganize versus a foreign proceeding that's designed to liquidate. It defines foreign proceeding when it's specified that a foreign proceeding can have as its purpose, quote, reorganization, end quote, or, quote, liquidation. They're different things. Again, suggesting the two terms differ, reorganization is not including a liquidation, and liquidation is not simply a kind of reorganization. In other words, Your Honors, literal application of Section 1114G requires reversal, unless doing so is at odds with the purpose of the statute or creates an absurdity. And it does neither. And the reason it does neither, interpreting Section 1114G as written is consistent with its history and language. It suggests that the purpose of the statute is to protect retiree benefits except when necessary to prevent liquidation. And we cited statements of Senators Hines and Metzenbaum to that effect at page 38 of our opening brief. And it is certainly not absurd to limit the power to modify retiree benefits to cases in which the debtor is attempting to emerge from bankruptcy. That's the key. The debtor is attempting to emerge from bankruptcy. You have a reorganization in progress, even though there may be sales along the way of property. But you have here, and the bankruptcy court still found in multiple places, you have here a debtor that failed to reach a deal, failed essentially to reorganize, and had already determined that an orderly wind-down was what was at issue. Thank you. I think we've got it. Again, Your Honor, I do appreciate the extra time. It was a great presentation by both sides. Thank you.